IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| INTERNATIONAL PARTNERS FOR ETHICAL CARE, INC., ADVOCATES PROTECTING CHILDREN, PARENT 1A, PARENT 1B, PARENT 2A, PARENT 2B, PARENT 3A, PARENT 3B, PARENT 4A, and PARENT 4B, <br><br> *Plaintiffs,* <br><br> v. <br><br> JAY INSLEE, Governor of Washington, in his official capacity; ROBERT FERGUSON, Attorney General of Washington, in his official capacity; and ROSS HUNTER, Secretary of the Washington Department of Children, Youth, and Families, in his official capacity, <br><br> *Defendants.* | No. 3:23-cv-5736 <br><br> COMPLAINT |

## I. INTRODUCTION

1.      This lawsuit against Washington state officials is about whether a minor child who is receiving or even just seeking so-called "gender-affirming" treatment—which includes services that alter body parts, prescribe life-altering medications, and other related things—showing up at a youth shelter, homeless shelter, or a host home, provides sufficient grounds to steamroll parental constitutional rights. Under recently enacted SB 5599, that answer is "yes." Under the United States Constitution and the Washington State Constitution, however, that answer is "no."

2.      This lawsuit challenges Engrossed Senate Substitute Bill (SB) 5599 of the 2023 Regular Session of the 68th Legislature of Washington State, which is codified in relevant part at

Revised Code of Washington (Wash. Rev. Code.) § 13.32A.082(3), and took effect July 23, 2023. The statute infringes on parental constitutional rights.

3.      It takes away a requirement of notice to parents.

4.      It authorizes the State to refer a minor for "behavioral health services" without defining what that entails, potentially meaning that a minor could receive—at least—mental health services that the parents would not endorse, and arguably also medical treatment that the parents would not authorize. There is no age minimum in SB 5599 for such services.

5.      SB 5599 also delays when parents can get their children back from the State's control.

6.      In short, this statute allows shelters and homes to keep children at locations without their parents' knowledge and refer those children for health interventions without their parents' knowledge or approval. It does not require children to be returned on any particular timetable or under any particular conditions.

7.      This suit is thus brought as a pre-enforcement challenge against statewide officials, in their official capacities, over this new Washington statute that discriminatorily deprives certain parents—but not all parents—of their fundamental right under the U.S. Constitution to direct the care and upbringing of their children, as well as their rights to the free exercise of religion, due process, free speech, and equal protection. Plaintiffs bring this suit pursuant to 42 U.S.C. § 1983 because Defendants are acting under color of state law in violating Plaintiffs' rights under the First and Fourteenth Amendments to the U.S. Constitution.

## II. Parties.

8.      Plaintiff International Partners for Ethical Care, Inc., is a nonprofit organization incorporated in the State of Illinois and recognized as a charitable or educational public benefit organization under Section 501(c)(3) of the Internal Revenue Code. The organization's "mission is to stop the unethical treatment of children by schools, hospitals, and mental and medical healthcare providers under the duplicitous banner of gender identity affirmation." Partners for Ethical Care Homepage, https://tinyurl.com/4nrp5vn9 (last visited Aug. 15, 2023). Members of

this organization include approximately two dozen parents in the State of Washington, including at least one resident of the State of Washington who is a parent in the state with a transgender minor child.

9.     Advocates Protecting Children is a nonprofit 501(c)(3) organization. It is "dedicated to fighting the gender industry, and especially its predation on children in the form of unethical social and medical transition for the sake of political and financial profit." About Us, Advocates Protecting Children, https://tinyurl.com/3kun8vf2 (last visited Aug. 16, 2023).

10.     Parent 1A is a citizen of Washington and the mother of a 14-year-old biological girl who previously identified as a boy, whom we will call 1C.

11.     Parent 1B is the husband of Parent 1A and father of 1C. He is a citizen of Washington.

12.     The prior gender transition of 1C took place at school, unbeknownst to her parents, where the school encouraged the transition, including through meeting for two and a half months with a school counselor. 1C, after being removed from public school, de-transitioned and now again identifies as a girl. But 1A and 1B believe that when they put 1C back in school this fall, through the school's efforts which the school kept hidden from 1A and 1B, 1C will transition again and run away from home.

13.     Parent 2A is the mother of two transgender children: 2C, a biological girl who identifies as a boy and recently turned age 18, and 2D, another biological girl who identifies as a boy, is age 13. 2A is a citizen of Washington.

14.     Parent 2B is the husband of Parent 2A, the father of 2C and 2D, and a citizen of Washington.

15.     Parent 3A is the mother of a transgender child, 3C, a 14-year-old biological boy who identifies as a girl. 3C is also autistic. 3A is a citizen of Washington.

16.     Parent 3B is the husband of Parent 3A and the father of 3C. He is a citizen of Washington.

Complaint - 3
*IPEC v. Inslee*, No. 3:23-cv-5736

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

17.     3A and 3B are Roman Catholic. They believe in the teachings of the Roman Catholic Church on gender transitions and identity.

18.     Parent 4A is the mother of three children, including 4C, who is an eight-year-old girl, and 4D, a six-year-old boy. 4A is a citizen of Washington.

19.     Parent 4B is the husband of 4A and the father of 4C and 4D. He is a citizen of Washington.

20.     4A and 4B are non-denominational Christians who believe the Bible is the Word of God and, as such, is authoritative on every issue to which it speaks. They believe the topics on which the Bible provides teachings include gender transitions and identity.

21.     Defendant Jay Inslee is the Governor of the State of Washington. As such, he must enforce the laws of that state. *See* Wash. Const. art. III, § 5. Governor Inslee also supervises the Department Secretary who administers SB 5599, and the Governor has the authority to remove the Secretary, as discussed below.

22.     Governor Inslee signed SB 5599 on May 9, 2023.

23.     Governor Inslee is sued in his official capacity.

24.     Defendant Robert Ferguson is the Attorney General of Washington. As such, he is responsible for the legal defense of state statutes, including SB 5599. *See* Wash. Const. art. III, § 1; Wash. Rev. Code § 43.10.030.

25.     Attorney General Ferguson is sued in his official capacity.

26.     SB 5599 is administered by the Washington State Department of Children, Youth, and Families ("the Department" or "DCYF").

27.     The Department is an agency in the executive branch of the State of Washington. Wash. Rev. Code § 43.216.015.

28.     Defendant Ross Hunter is Secretary of the Washington State Department of Children, Youth, and Families.

Complaint - 4

*IPEC v. Inslee*, No. 3:23-cv-5736

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

29. Secretary Hunter "has the complete charge and supervisory powers over the department." Wash. Rev. Code § 43.216.025; *see also Matter of W.W.S.*, 469 P.3d 1190, 1204 (Wash. Ct. App. 2020) (outlining the Secretary's vast authority over the Department).

30. Secretary Hunter has authority over the Assistant Secretaries who issued the SB 5599 implementation Memo discussed below.

31. Secretary Hunter was appointed by Governor Inslee, with the consent of the Washington State Senate, and serves at the pleasure of the Governor. *See* Wash. Rev. Code § 43.216.025.

32. Secretary Hunter is sued in his official capacity.

### III. Jurisdiction and Venue.

33. This case presents federal questions arising under the Constitution of the United States and also seeks relief for the deprivation of federal rights under color of state law. This Court accordingly has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343.

34. This Court has authority to award Plaintiffs declaratory relief pursuant to 28 U.S.C. § 2201, and injunctive relief under 28 U.S.C. §§ 1343, 2202, and Fed. R. Civ. P. 65.

35. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the facts complained of herein occurred within this District and because this District is the seat of government of the State of Washington and therefore Defendants are domiciled in this District.

### IV. Facts.

**A. Statutory Scheme.**

36. During its most recent session, the Washington State Legislature enacted two statutes that amended Wash. Rev. Code § 13.32A.082. *See* 2023 Wash. Legis. Serv. Ch. 151 (SHB 1406); 2023 Wash. Legis. Serv. Ch. 408 (ESSB 5599). Both acts went into effect on July 23, 2023.

37. SB 5599 modified the rights and procedures of Washington state law concerning parents in the upbringing and custody of their children.

38.     In Washington, the baseline rule governing parental rights when children go to a shelter is that when a shelter "knows at the time of providing the shelter that the child is away from a lawfully prescribed residence or home without parental permission, it must contact the youth's parent within 72 hours, but preferably within 24 hours, following the time that the youth is admitted to the shelter or other licensed organization's program." Wash. Rev. Code § 13.32A.082(1)(b)(i). Further, that "notification must include the whereabouts of the youth, a description of the youth's physical and emotional condition, and the circumstances surrounding the youth's contact with the shelter or organization." Id.

39.     Thus, under this baseline rule, no later than 72 hours after a minor shows up at a shelter, parents must be told exactly where the child is, as well as how the child is and how the child ended up at the shelter, and the parents are free to go pick up their child and take him or her home.

40.     The only exception to this statutorily imposed duty of shelters is that "[i]f there are compelling reasons not to notify the parent, the shelter or organization must instead notify the department"—that is, the state Department of Children, Youth and Families. Id. (emphasis added). Additionally, "compelling reasons" were previously defined as "circumstances that indicate that notifying the parent or legal guardian will subject the minor to abuse or neglect as defined in [another code section]." Id. § 13.32A.082(2)(c).

41.     But SB 5599 expanded the definition of "compelling reasons" to now also include "[w]hen a minor is seeking or receiving protected health care services." Id. § 13.32A.082(2)(c)(ii). And "'protected health care services' means "gender affirming treatment" as defined in [another code section]." Id. § 13.32A.082(2)(d).

42.     In other words, to determine whether the exception to the baseline rule applies, there is no longer an inquiry into traditional abuse or neglect but merely a categorical triggering of "compelling reasons" whenever a minor shows up at a shelter seeking certain health services. Put another way, under SB 5599, a child merely showing up at a shelter or host home seeking or receiving "gender-affirming" treatment is legally equivalent to "circumstances that indicate" abuse or neglect.

Complaint - 6

*IPEC v. Inslee*, No. 3:23-cv-5736

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

43.     Children run away for a host of reasons, including much less serious ones, such as:

- "birth of a new baby in the family;"

- "family financial worries;"

- "problems at school;"

- "peer pressure;"

- "failing or dropping out of school;"

- "death in the family;"

- "parents separating or divorcing or the arrival of a new stepparent;"

- "kids . . . drinking alcohol or taking drugs,"

*Running Away*, Nemours KidsHealth (June 2018), https://tinyurl.com/5n6vjpev (medically reviewed by Steven Dowshen, MD).

44.     Additionally, SB 5599, along with SHB 1406, another new statute that went into effect at the same time, modifies a related provision, Wash. Rev. Code § 13.32A.082(3), to facilitate potentially life-changing medical treatments for the child, without first providing adequate parental notice or receiving parental consent. As modified, the latter provision now reads as follows, with the SB 5599 amended provisions bolded and the SHB 1406 amended provisions italicized:

(3) (a) When the department receives a report under subsection (1) of this section, it shall make a good faith attempt to notify the parent that a report has been received and offer services to the youth and the family designed to resolve the conflict, including offering family reconciliation services, and accomplish a reunification of the family. The department shall offer services under this subsection as soon as possible, but no later than three days, excluding weekends and holidays, following the receipt of a report under subsection (1) of this section.

(b) When the department receives a report under subsection (1) of this section for a minor who is seeking or receiving protected health care services, it shall:

(i) Offer to make referrals on behalf of the minor for appropriate behavioral health services; and

(ii) Offer services designed to resolve the conflict and accomplish a reunification of the family.

Wash. Rev. Code § 13.32A.082(3).

**B.     Notice.**

45.     These amendments appear to exempt from the usual parental notice requirement a scenario in which a minor is seeking or receiving protected health care services, since the action required in that specific scenario is covered by Subsection 3(b), which does not refer to parental notification. That conclusion is reinforced by the "commonplace" rule "of statutory construction that the specific governs the general." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018) (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)).

46.     Additionally, reading Subsection 3(a), which applies to scenarios where there are compelling reasons not to notify parents, as simultaneously applying alongside Subsection 3(b), which specifies the subset of compelling reasons in which minors are seeking or receiving protected health services, would make 3(b)(ii) surplusage, since nearly the same thing is said in 3(a). Such interpretation would violate the fundamental rule of statutory interpretation that a court must "if possible . . . give effect to each word and clause in a statute." *United States v. Lopez*, 998 F.3d 431, 440 (9th Cir. 2021). Thus, a fair reading of the new statutory provision would authorize potentially life-changing medical treatments before notification to parents.

47.     Additionally, when statutory language is unclear, conflicting, or silent, Washington state courts resort to legislative history. *See Gorre v. City of Tacoma*, 357 P.3d 625, 631 (Wash. 2015) ("We must therefore resort to other aids of statutory interpretation to resolve th[e] [statutory] ambiguity. And one of those aids—legislative history—ends our analysis." (citation omitted)); see also *In re Marriage of Kovacs*, 854 P.2d 629, 634 (Wash. 1993) ("[I]n determining the legislative purpose and intent the court may look beyond the language of the Act to legislative history.").

48.     The legislative history strongly indicates that the Washington State Legislature intended to deprive parents of their ordinary parental rights when their child presents at a shelter receiving or seeking "gender-affirming" treatment. As legal counsel for the Committee explained, "Under this bill, they [i.e., personnel at a shelter or from the Department] do not need to contact the parent if a compelling reason exists—which includes but is not limited to notifying the parent will subject the minor to child abuse and neglect or the minor is seeking protected health care

services." Hearing on SB 5599 Before the S. Hum. Servs. Comm., 68th Leg., 2023 Sess. (Feb. 14, 2023) (statement of Alison Mendiola, Coordinator & Counsel for the Comm, at 28:44-29:03), available at https://tinyurl.com/mry8dwta.

49.     Remarkably, under the text and legislative history of SB 5599, it appears that parents of children with circumstances indicating that notifying the parent or legal guardian will subject the child to abuse or neglect will still receive notification from the Department regarding their child. In contrast, the parents of children without such circumstances who seek or receive protected health services will not receive notification.

50.     Nevertheless, Secretary Ross's subordinates insist that SB 5599 would not operate entirely in this manner, despite the statements above and below from the statute's sponsors and legislative supporters.

51.     Natalie Green is Assistant Secretary of Child Welfare Field Operations at the Department, and Steve Grilli is Assistant Secretary of Partnership, Prevention, and Services at the Department. See Our Leadership, Wash. State Dep't of Children, Youth & Families, https://tinyurl.com/9ryktvwh (last visited Aug. 15, 2023).

52.     On July 21, 2023, Green and Grilli issued a Policy Memo in which they claimed that, in implementing SB 5599 regarding a homeless youth seeking "gender-affirming" treatment, a caseworker must "[m]ake a good faith attempt to contact the youth's parent or legal guardian to offer FRS [i.e., family reconciliation services] to resolve the conflict and accomplish a reunification of the family." Natalie Green & Steve Grilli, Policy Memo: Changes to 3100, Family Reconciliation Services Policy, Wash. Dep't of Children, Youth & Families 2 (July 21, 2023), https://tinyurl.com/u5fzeu2x.

53.     The Memo goes on to specify that "[w]hen making a good faith attempt, caseworkers must at minimum do the following," and specifies as two of the items on that list, "Ask the youth or shelter to provide contact information for the youth's parents or legal guardians, if known," and, "Contact the parents or legal guardians as outlined in the current FRS policy, if

Complaint - 9
*IPEC v. Inslee*, No. 3:23-cv-5736

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

contact information is provided." Id. (emphasis added). Should the child not provide such contact information, the Memo indicates that no notification will be provided to the parents.

54.     The Memo provides no explanation for why the lawmakers quoted below who wrote, sponsored, and supported SB 5599, as well as the lawmakers quoted below who opposed the bill, were all of one mind regarding the bill's effect of denying parents notification when their children are seeking or receiving protected health services. Nor does the Memo explain away the clear meaning of the bill's words, which contradict the Memo.

**C.     Timing of Notice.**

55.     Even if one reads the statute to violate general-specific and anti-surplusage canons such that Subsection 3(a) also applies to everyone under Subsection 3(b), SB 5599 still changes the timing of the notice to parents in a way that substantially impairs parental rights. Before SB 5599's amendments, a parent of a child receiving "gender-affirming" treatment who showed up at a shelter without providing personnel any reason to suspect abuse or neglect would receive notification within 72 hours. *See* Wash. Rev. Code § 13.32A.082(1)(b)(i).

56.     But now, under the revised Subsection 3(a), assuming it even applies to these parents, the Department does not have to provide parental notification until three business days after they receive a report from the shelter. And the shelter does not have to provide a report to the Department until 72 hours have elapsed (if there is even any time requirement at all in a compelling reasons scenario—the statute is not clear).

57.     Thus, SB 5599 and SHB 1406 change the notification time from 72 hours to as many as nine days if a three-day weekend interrupts the three-business-day clock. Nearly an additional week without notification can be an eternity for parents whose child is missing.

**D.     Content of Notice.**

58.     Next, assuming Subsection 3(a) applies to parents with minors seeking or receiving protected health services, the statutory changes also alter the level of detail that must be provided to parents. Ordinarily, without compelling reasons, the shelter must provide the child's location,

Complaint - 10
*IPEC v. Inslee*, No. 3:23-cv-5736

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1   condition, and circumstances for arriving at the shelter. *See* Wash. Rev. Code §
2   13.32A.082(1)(b)(i).

3   59.   But under revised Subsection 3(a), all the Department must provide in its notice
4   about the child is that it received a report from a shelter. Nothing requires the Department to
5   provide the location, condition, or circumstances. Thus, parents will not know where their child is
6   or how he or she is doing, and without the former, they cannot go and get the child. So this change
7   in the law deprives certain parents—for whom there is no suspicion of neglect or abuse—of crucial
8   knowledge about their child and the ability to get their child from the shelter.

9   **E.   Treatment for Child.**

10   60.   The changes by SB 5599 also remove from parental control choices about treatment
11   for a child under Paragraph 3(b)(i). This provision now enables the Department to "[o]ffer to make
12   referrals on behalf of the minor for appropriate behavioral health services." Nowhere is
13   "appropriate behavioral health services" defined in the statute or elsewhere in Washington state
14   law. And so, statutory silence requires a resort to legislative history.

15   61.   Washington State Senator Marko Liis, a sponsor of SB 5599, explained during a
16   legislative hearing on his bill:

17   > What this bill speaks to is when a young person is seeking certain essential health care
     > services, … to make critical decisions about their future or seeking gender-affirming care
18   > in the face of opposition and hostility from their family. In those cases where that
     > reunification process would separate that vulnerable young person from the health care
19   > that they're entitled to… When a family is standing between their young person and
     > essential health care services there, and we need to focus on the essential needs of the
20   > young person. In short, they're getting the care they deserve.

21   Senate Floor Debate on SB 5599 (Mar. 1, 2023) (statement of Sen. Marko Liias, Sponsor, at
22   1:24:48–1:26:00) (emphasis added), available at https://tinyurl.com/75jaep4t.

23   62.   In sum, SB 5599 allows the Department to stand in the place of parents and
24   authorize potentially life-altering (and even sterilizing) "gender-affirming" treatment and mental
25   therapy services for minors when they show up at a shelter or host home seeking or claiming to
26   have received protected health services. And SB 5599 allows the Department to do that even in the
27   face of disagreement or opposition from the parents.

COMPLAINT - 11

*IPEC v. INSLEE*, No. 3:23-cv-5736

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

**F.      Timing of Child's Return.**

63.      Finally, SB 5599 significantly delays the return of a child back to their parents. That is not only because parents will not know their child's location so they can pick the child up, but also because nothing in these statutory changes requires the Department to return the child, and certainly not on any specific timeline. All that Paragraph 3(b)(ii) does is require the Department to "[o]ffer services designed to resolve the conflict and accomplish reunification of the family." But, until that conflict is resolved—to whose satisfaction the statute does not say, but likely, to the Department's—reunification will not be required, meaning the Department will be under no mandate to return the child.

64.      Here again, the legislative history supports this reading of the statutory text. Sponsor Sen. Liias said the law is for "those cases where that reunification process would separate that vulnerable young person from the health care that they're entitled to . . . . When a family is standing between their young person and essential health care services there, and we need to focus on the essential needs of the young person. In short, they're getting the care they deserve. And then focus on the important reunification process." Senate Floor Debate on SB 5599 (Mar. 1, 2023) (statement of Sen. Marko Liias, Sponsor, at 1:24:48–1:26:00). In other words, when the Department can provide the services it thinks the child needs without parental consent, it will attempt reunification at some point following those services. But the statute is silent about what triggers reunification and when that would occur. And that silence creates a serious additional risk that parental rights will be impaired.

65.      Here again, the legislative history indicates that is exactly what the proponents of SB 559 intended. During the legislative debates, proponents of the bill frequently framed recalcitrant parents as the problem SB 5599 was designed to solve. On the Senate floor, for example, Sponsor Sen. Marko Liias referred to the "opposition and hostility from their family" children seeking these services would face and how "a family is standing between their young person and essential health care services." Senate Floor Debate on SB 5599 (Mar. 1, 2023) (statement of Sen. Marko Liias, Sponsor, at 1:24:48–1:26:00); *see also* Taija Perry Cook & Joseph

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

O'Sullivan, WA Transgender Youth Bill Targeted in National Culture War, Crosscut (May 1, 2023), https://tinyurl.com/mva94s (quoting Sen. Liias as stating that "family members are actively contributing to the unsafe circumstances that led them to [the shelter]"). Never mind that some of these services have potentially life-altering, negative consequences for the child—including, in some cases, sterilization.

66.   On the floor of the Washington State House, Representative Jamila Taylor likewise described the purpose of the bill as saving kids from their parents:

> "I just want to remind you, Mr. Speaker, that we're talking about children who are not in this room hearing really encouraging language from their parents. It's the combination, the tone, the tenor, the threats, the isolation, the words that are constantly told you cannot be uniquely you. You cannot be something other than what I desire for you to be. And if you do not follow my rules, you cannot be here. If you want to follow my rules, I'm not even gonna give you the safety, the comfort that you so desire when you want to be uniquely you. Mr. Speaker, the microaggressions, the language a parent—I really wish more parents had the skills that the parents were in this room talking about how they would want to affirm their children, but say no. I wish more parents had that. But I see a young person come to me on a regular basis saying I can't go home. Home is not safe. … I tell you there are some unhealthy family dynamics out there and that child, that child wants to go home, wants to see the love from their parents. They need some way to communicate better with their parent. Their parent needs another way to speak to this child, to get them through the toughest parts part of their life. We must step in. We must provide a place for this child."

House Floor Debate on SB 5599 (Apr. 12, 2023) (statement of Rep. Jamila Taylor, Representative, at 1:42:32–1:44:55), available at https://tinyurl.com/4wdbhape.

67.   Senator Yasmin Trudeau similarly declared:

> "And what ends up driving, you know, that the driving force often, especially for, for our trans youth is the lack of acceptance. And we know the statistics when it comes to suicide, when it comes to, you know, homelessness, when it comes to other issues that disproportionately impact trans youth. It is a result of rejection by their family, by the lack of love and support that's shown. And so I think that we all have, we would love to know that every family is a family that supports their children. But Mr. President, that just isn't the case . . . . So I just say, yes, for those of us that, that have the means and the resources and the ability to love: wonderful. Many families don't. And for the kids that come from those families, they deserve the support and love as well as support this bill."

Senate Floor Debate on SB 5599 (Mar. 1, 2023) (statement of Sen. Yasmin Trudeau, at 1:55:00–1:57:00).

ARD LAW GROUP PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

68.     Of course, nothing in the statute requires any finding that the parents kicked the child out of the home or in any other way neglected or abused their child to trigger the various constitutional infringements to parents SB 5599 authorizes. In the eyes of these legislators, the parents' "sin" need be nothing more than the parents' desire to allow their child to mature before making permanent life-altering decisions about whether the child will ever be capable of becoming a biological parent.

69.     In sum, because of SB 5599, where there is no indication of past or future abuse or neglect, parents are treated differently under the law depending on whether their minor children, when showing up to a shelter, are seeking or receiving "gender-affirming" treatment. Under those two circumstances—but only those two circumstances—the parents of that minor are treated differently than other parents.

70.     Under those two circumstances—but only those two circumstances—there is no process or procedure for determining if parents should be notified of the location and well-being of their children or instead denied control over the treatment of their child and denied having their child at home for a longer, indefinite period. The absence of such a process or procedure is a serious deprivation of a parent's constitutional rights.

## G.     Religious Beliefs of Some Plaintiffs.

71.     SB 5599 also interferes with the ability of some parents to comply with their religious beliefs on matters of "gender-affirming" care.

72.     For example, the Roman Catholic Church teaches that a human body is intentionally and purposefully created by God as either male or female.

73.     As embraced by Parents 3A and 3B, the Roman Catholic Church teaches:

> Everyone, man and woman, should acknowledge and accept his sexual identity. Physical, moral, and spiritual difference and complementarity are oriented toward the goods of marriage and the flourishing of family life. The harmony of the couple and of society depends in part on the way in which the complementarity, needs, and mutual support between the sexes are lived out.

*Catechism of the Catholic Church* para. 2333, available at https://tinyurl.com/rwsdv27e (last visited Aug. 16, 2023).

Complaint - 14
*IPEC v. Inslee*, No. 3:23-cv-5736

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

74.     Those Plaintiffs additionally adhere to the doctrine of the Roman Catholic Church, when it teaches, "By creating the human being man and woman, God gives personal dignity to the one and the other. Each of them, man and woman, should acknowledge and accept his sexual identity." *Catechism of the Catholic Church* para. 2393.

75.     As to the religious faith of Parents 4A and 4B, whose beliefs on these issues are informed by the Bible as they understand it, they know the Bible to teach that man and woman are created by God as male or female, respectively, *see* Genesis 1:27 ("So God created man in his own image, in the image of God he created him; male and female he created them."), that sexual activity is to be confined to a marriage relationship of a person of the opposite biological sex, *see* Leviticus 18:22 ("You shall not lie with a male as with a woman; it is an abomination"), and that biological males and females are not to embrace gender expressions in their manner of dress that reflects society's expression of the opposite biological sex, *see* 1 Corinthians 11:14–15 (discussing manners of dress associated with men and distinct from those associated with women).

76.     Parents 3A and 3B believe that their faith places upon them a religious obligation to teach these religious beliefs to their children and guide them in living them. As the Catechism teaches, "Through the grace of the sacrament of marriage, parents receive the responsibility privilege of evangelizing their children. Parents should initiate their children at an early age not the mysteries of the faith of which they are the 'first heralds' of their children. They should associate them from their tenderest years with the life of the Church . . . ." *Catechism of the Catholic Church* para. 2225, available at https://tinyurl.com/5t328kwa (last visited Aug. 16, 2023).

77.     Parents 4A and 4B likewise hold this belief, as they believe God commands them to do so in the Bible. *See, e.g.*, Deuteronomy 6:6–7 ("And these words that I command you today shall be on your heart. You shall teach them diligently to your children, and shall talk of them when you sit in your house, and when you walk by the way, and when you lie down, and when you rise."); Ephesians 6:4 ("Fathers, do not provoke your children to anger, but bring them up in the discipline and instruction of the Lord."); 2 Timothy 3:16–17 ("All Scripture is breathed out by God and

Complaint - 15
*IPEC v. Inslee*, No. 3:23-cv-5736

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

profitable for teaching, for reproof, for correction, and for training in righteousness, that the man of God may be complete, equipped for every good work.").

**H.    SB5599 Interferes with First and Fourteenth Amendment Rights.**

78.    Notwithstanding parents' constitutional rights to direct the upbringing of their children, with SB 5599, children of any age under seeking "gender-affirming" treatment can do so through the Department if that child is in a homeless shelter or host home.

79.    Guidelines from the World Professional Association of Transgender Health (WPATH) recommends no age restrictions for transition therapy. Children as young as 8 have received puberty blockers and opposite-sex hormones, and girls as young as 12 have received mastectomies.

80.    Moreover, as the bill's proponents made clear in the legislative history, SB 5599 penalizes parents of transgender children who both use the pronouns that correspond to the children's biological sex and refuse to use those children's preferred pronouns or name. By penalizing parents' refusal to engage in "gendering-affirming" speech and speaking contrary to it, SB 5599 equates such speech and refusal to speak with child abuse.

81.    Governor Inslee appears to agree. He has declared regarding SB 5599, "With this bill, Washington leads the way . . . to support these youth as they access gender-affirming treatment." Trans Minors Protected from Parents under Washington Law, Associated Press (May 9, 2023), https://tinyurl.com/ynx7nm95.

82.    In the context of asserting First Amendment and related rights in a pre-enforcement challenge, so long as the necessary actors have "laid the groundwork," standing exists even though those actors "ha[ve] yet to carry out [their] plans." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2308 (2023). It is enough that they worry that the State of Washington "will force [them] to express views with which [they] disagrees." *Id.*; *see also Laird v. Tatum*, 408 U.S. 1, 14 (1972) (noting that pre-enforcement standing is satisfied in the free speech context by claiming "a threat of specific future harm").

83.     Furthermore, the Ninth Circuit has determined that a scenario where the "government has not disavowed enforcement of the [challenged] Provision is evidence of an intent to enforce it." *Arizona v. Yellen*, 34 F.4th 841, 850 (9th Cir. 2022).

84.     Additionally, given the vagueness of what parents need to do to convince the Department to return their child and "accomplish a reunification of the family," it is highly likely the Department will require parents to affirm through their speech their child's choices as to gender identity, thus compelling the parents' speech.

85.     Likewise, given how SB 5599 now incentivizes youth to run away, knowing how SB 5599 will allow the State to keep their child from them will result in chilling the parents' speech. For example, parents may cease using the child's given name and pronouns that correspond with the child's biological sex out of fear caused by SB 5599.

86.     Plaintiffs must show "a credible threat" exists that the State would enforce SB 5599 against them. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

87.     Here, this credible threat exists because of Washington's "record of past enforcement actions under" similar statutes. *See 303 Creative*, 143 S. Ct. at 2309. Here, as in multiple U.S. Supreme Court cases, unless Washington is ready to publicly "disavow future enforcement" of such laws, *id.* at 2310 (internal quotation marks omitted), Plaintiffs have standing to challenge them.

88.     Attorney General Ferguson has amply demonstrated his enthusiasm for aggressively enforcing laws pertaining to being transgender.

89.     For example, he filed an amicus brief supporting trans bathrooms in public schools. *See* AG Ferguson in Gavin Grimm Case: Uphold Transgender Rights, Wash. State Off. of the Att'y Gen. (May 16, 2017), https://tinyurl.com/2s4dmh6a. He also participated in an organized effort to convince Target to reestablish its LGBT children's clothing section during Pride Month. *See* Attorney General Bob Ferguson (@AGOWA), Twitter (June 20, 2023, 1:37 PM), https://tinyurl.com/24jtk554.

Complaint - 17

*IPEC v. Inslee*, No. 3:23-cv-5736

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

90.     Attorney General Ferguson also aggressively pursues this transgender agenda even when it infringes upon religious liberty. *See, e.g.*, Nina Shapiro, Seattle Pacific University Sues WA Attorney General, Saying Probe Into LGBTQ+ Policies Violates Religious Freedom, Seattle Times (July 30, 2022), https://tinyurl.com/nhe9jp3b.

91.     Additionally, the immediate likelihood of harm from SB 5599 is present because several of the Plaintiffs here have dealt with potential runaway children.

92.     Parent 2A and Parent 2B have two transgender children who have credibly threatened to run away and explore places they could go. Both children are biological females. This included one instance where the older, driving-age child was ready to provide transportation to take the younger child (too young to drive) to an environment that would provide gender affirmation.

93.     A primary reason the children of Parent 2A and Parent 2B threatened to run away and explored doing so is because the parents declined to refer to the children by their preferred names and pronouns, and instead referred to them by their birth names and biological pronouns.

94.     Parent 3A and Parent 3B also dealt with a potential runaway situation. One of their transgender children was encouraged by some adults to run away from their home and live in a place where the adults in charge would verbalize gender affirmation by using opposite-sex names and pronouns.

95.     Two such adults offered their home as such a place. Parents 3A and 3B believe that a similar episode recently occurred with another of their transgender children, in which the parents of a school friend surreptitiously arranged for their child to spend time in the home, during which time the parents of the school friend would speak to the child of Parents 3A and 3B with the child's preferred transgender name and preferred pronouns.

96.     And even for those Plaintiffs whose children have not threatened to run away, SB 5599 changes the legal landscape such that children who may not have considered running away before now have an incentive to do so under the law because they can obtain health care services they desire without parental permission.

Complaint - 18
*IPEC v. Inslee*, No. 3:23-cv-5736

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

97.     For all these reasons, SB 5599 creates a significant risk that if one of Plaintiffs' children wishes to transition to a gender different from their biological sex—and that is a substantial risk for each of the children described above--one of the Defendants or their agents would facilitate the child's obtaining such a transition, contrary to the parents' desires for their children, or contrary to their religious beliefs, or both. Such an action by an agent of the State of Washington would violate the affected Plaintiffs' constitutional right to direct their child's upbringing, and their First Amendment right to teach and guide their child's activities in a manner consistent with the parents' faith commitments. This significant risk of a constitutional violation is the proximate result of SB5599.

## V. Causes of Action.

**A.      Count I: Federal Due Process Clause—Parents' Right to Direct Upbringing of Children; U.S. Const. Amend. XIV, § 1, Cl. 3.**

98.     Plaintiffs hereby incorporate the allegations made in each preceding paragraph of this Complaint as if fully set forth herein.

99.     The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1, includes certain substantive rights. Fundamental rights under the Constitution of the United States are "deeply rooted in this Nation's history and tradition," such that the right is "fundamental to our scheme of ordered liberty." *McDonald v. City of Chi.*, 561 U.S. 742, 767 (2010) (internal quotation marks and emphasis omitted).

100.    Among these is parents' fundamental right to direct their children's upbringing. *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925); *see also Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion) (discussing a long line of cases where the Supreme Court has "recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children").

101.    Because the "right to rear children without undue governmental interference is a fundamental component of due process," laws that burden that right are subject to strict scrutiny, whereby the Fourteenth Amendment "forbids the government to infringe certain fundamental

Complaint - 19
*IPEC v. Inslee*, No. 3:23-cv-5736

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling government interest." *Nunez v. City of San Diego*, 114 F.3d 935, 951-52 (9th Cir. 1997) (emphasis omitted) (internal quotation marks omitted).

102.    A parent dealing with a child who seeks "gender-affirming" treatment is dealing with an archetypal issue of raising and the upbringing of that child.

103.    A parent has the right to make medical decisions for his or her child. SB 5599 violates that right by giving the Department authority to make referrals, without notice to or consultation with parents, for "appropriate behavioral health services" for a child seeking gender-affirming care.

104.    SB 5599 thus interferes with the fundamental right of parents to direct the upbringing of children dealing with those two issues, including children of several Plaintiffs here, by authorizing the child to engage in "treatment" not authorized by the parent, by authorizing the State to provide such treatment, and by preventing parents from raising their children in the manner they think best.

105.    Plaintiffs have no adequate remedy at law.

106.    The actions Defendants are now required to take under SB 5599 violate federal law, specifically by violating Plaintiffs' right to direct the upbringing of their children. Absent injunctive relief, Defendants' actions continue to threaten to harm Plaintiffs by impairing their enjoyment of this right.

**B.    Count II: Federal Due Process Clause—Parents' Right to Custody of Children; U.S. Const. Amend. XIV, § 1, Cl. 3.**

107.    Plaintiffs hereby incorporate the allegations made in each preceding paragraph of this Complaint as if fully set forth herein.

108.    The Supreme Court has held that the Due Process Clause secures the related substantive right of parents to have custody of their children. *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (recognizing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"). Here, this is

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

inextricably intertwined with the right of a family to live together. *Moore v. City of E. Cleveland*, 431 U.S. 494, 498–500 (1977) (plurality opinion); *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1311 (9th Cir. 1982).

109.    By denying to parents of children who seek the aforementioned health care services information about the location of their children, as well as the custody and control of their children, SB 5599 interferes with the fundamental right of parents to have custody of their children and keep the family unit together as a household.

110.    Plaintiffs have no adequate remedy at law.

111.    The actions Defendants are now required to take violate federal law, specifically by violating Plaintiffs' right to custody of their children and their right to keep their family together. Absent injunctive relief, Defendants' actions continue to threaten to harm Plaintiffs by impairing their enjoyment of this right.

**C.    Count III: Federal Free Exercise Clause; U.S. Const. Amend. I, Cl. 2.**

112.    Plaintiffs hereby incorporate the allegations made in each preceding paragraph of this Complaint as if fully set forth herein.

113.    The Free Exercise Clause of the First Amendment to the United States Constitution mandates that no instrumentality of any government in the United States shall enact any "law … prohibiting the free exercise" of religion. U.S. Const. amend. I, cl. 2. That right applies to the States through the Fourteenth Amendment. *See Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022).

114.    The Free Exercise Clause protects the right of individuals "to live out their faiths in daily life through the performance of (or abstention from) physical acts." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (internal quotation marks omitted).

115.    Also, "[t]he Free Exercise Clause of the First Amendment protects against indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson*, 142 S. Ct. at 1996 (internal quotation marks omitted).

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

116.    The free exercise of religion is a fundamental right, and a law goes to the core of that protected right when it involves raising children in accordance with the parents' religious faith. *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972).

117.    A parent cannot raise a child in accordance with his or her faith if the parent cannot communicate with, know the location of, or control the custody and care of their child, abilities that are denied under SB 5599 to parents whose children show up at a shelter and seek or are receiving the protected health care services noted above.

118.    A parent has the right to make medical decisions for his or her child consistent with the parent's religious faith. SB 5599 violates that right by giving the Department authority to make referrals for "appropriate behavioral health services" for a child seeking "gender-affirming" treatment.

119.    Furthermore, SB 5599 provides that the Department shall offer "services designed to resolve the conflict and accomplish a reunification of the family." Wash. Rev. Code § 13.32A.082(3)(b)(ii). To the extent that doing so would violate the religious beliefs of those parents, as it could well do with Parents 3A, 3B, 4A, and 4B, it penalizes the parents for living in accordance with their faith.

120.    Under free exercise doctrine, even if a law is neutral and generally applicable to religiously motivated conduct, strict scrutiny is still warranted when the Free Exercise Clause and "other constitutional protections" are involved, such as parental rights. *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 881 (1990) (citing *Yoder*, 406 U.S. 205).

121.    Even if SB 5599 would typically be considered a neutral and generally applicable law, the Supreme Court specifically held in *Yoder* that laws that interfere with raising children according to the parents' religious faith are subject to strict scrutiny, and *Yoder* remains good law. Thus, strict scrutiny applies here under *Yoder* and *Smith's* recognition that both free exercise and parental rights are implicated.

122.    Strict scrutiny is a high bar. As the U.S. Supreme Court has emphasized, a law "can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to

1  achieve those interests." *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1881 (2021) (quoting *Church of the*

2  *Lukumi Babalu Aye, Inc., v. City of Hialeah*, 508 U.S. 520, 546 (1993)). "Put another way, so long

3  as the government can achieve its interests in a manner that does not burden religion, it must do

4  so." *Id.*

5     123. Defendants cannot satisfy strict scrutiny here because, even if they can satisfy the

6  compelling-interest prong of the test, the law is not narrowly tailored because it is overinclusive,

7  sweeping in situations where there is no abuse or neglect, as well as situations where the child may

8  have shown up at a shelter having nothing to do with "gender-affirming" treatment. *See Lukumi*,

9  508 U.S. at 538 (finding laws violated the Free Exercise Clause because "they proscribe more

10  religious conduct than is necessary to achieve their stated ends").

11     124. Plaintiffs have no adequate remedy at law.

12     125. The actions Defendants are now required to take violate federal law, specifically by

13  violating Plaintiffs' right to raise their children according to the parents' faith. Absent injunctive

14  relief, Defendants' actions continue to threaten to harm Plaintiffs.

15  **D.** **Count IV: Federal Free Speech Clause; U.S. Const. Amend. I, Cl. 3.**

16     126. Plaintiffs hereby incorporate the allegations made in each preceding paragraph of

17  this Complaint as if fully set forth herein.

18     127. The Free Speech Clause of the First Amendment to the United States Constitution

19  mandates that no instrumentality of any government in the United States shall enact any "law …

20  abridging the freedom of speech." U.S. Const. amend. I, cl. 3. That right applies to the States

21  through the Fourteenth Amendment. *Prete v. Bradbury*, 438 F.3d 949, 961 (9th Cir. 2006).

22     128. Yet another reason for First Amendment protections is "because the freedom of

23  thought and speech is indispensable to the discovery and spread of political truth. By allowing all

24  views to flourish, the framers understood, we may test and improve our own thinking both as

25  individuals and as a Nation." *303 Creative*, 143 S. Ct. at 2311 (internal quotation marks omitted).

26  "Gender-affirming" treatment is one of the most controversial political issues in American life,

27  meriting the apex of First Amendment protection.

Complaint - 23

*IPEC v. Inslee*, No. 3:23-cv-5736

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

129.    SB 5599 has the effect of simultaneously compelling and chilling speech in accordance with the views of the majority of the state legislature and the Governor.

130.    The legislative history of SB 5599 shows the statute's supporters equate a parent who does not verbally affirm a child's gender identity by using the child's preferred names and pronouns with an abusive environment, arguing that such abuse is what makes the statute's provisions necessary. By doing so, SB 5599 chills protected speech, as parents with a transgender child may fear to use certain speech (birth name, preferred pronouns) or say certain things ("You are still the same gender as when you were born") that could lead to the child seeking to trigger SB 5599. And chilling free speech can violate the Constitution. *See Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) ("[C]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental efforts that fall short of a direct prohibition against the exercise of First Amendment rights . . . .") (internal quotation marks omitted).

131.    Likewise, the vagueness associated with what parents must do to qualify for reunification with their child violates the First Amendment by chilling speech. *See F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) ("When speech is involved, rigorous adherence to [void for vagueness doctrine] requirements is necessary to ensure that ambiguity does not chill protected speech."); *see also Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998).

132.    When parents speak on issues of "gender-affirming" treatment with their children, the right to free speech converges with the fundamental right to raise children.

133.    For Plaintiffs 3A, 3B, 4A, and 4B, this aspect of SB 5599 infringes upon a third fundamental right. Speaking words based on faith is protected by both the Free Speech Clause and the Free Exercise Clause. An example is prayer, regarding which the Supreme Court held that "[b]oth the Free Exercise and Free Speech Clauses of the First Amendment protect [those] expressions . . . ." *Kennedy*, 142 S. Ct. at 2416. Given that the right to direct the upbringing of children is implicated as well, when the parent speaks on gender identity from the vantage point of religious faith, SB 5599 sits on a nexus of at least three violations of fundamental rights.

134.    As to compelled speech, SB 5599 provides that the Department shall offer "services designed to resolve the conflict and accomplish a reunification of the family." To the extent that such "reunification" would be contingent on the parents' using a child's preferred name and preferred pronouns, the Department would be compelling speech by coercing a parent to say words they do not believe.

135.    For parents such as Plaintiffs here, even when LGBT issues and children are concerned, the Supreme Court has held that the First Amendment does not allow the State to "interfere with [their] choice not to propound a point of view contrary to [their] beliefs." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 654 (2000). "As these cases illustrate, the First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply misguided, and likely to cause anguish or incalculable grief." *303 Creative*, 143 S. Ct. at 2312 (internal quotation marks omitted).

136.    These protections are heightened, if anything, where the State commands that a person must give utterance to particular views because, as a general matter, "the government may not compel a person to speak its own preferred messages." *Id.*

137.    SB 5599 thus abridges free speech in three regards. First, it penalizes parents for expressing their views on gender identity.

138.    Second, this is also compelled speech. SB 5599 penalizes parents for not expressing support for a child's gender identity, including not using "preferred pronouns" when speaking to or referring to a transgender child, equating such speech with child abuse. Compelled speech violates the Free Speech Clause. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 138 S. Ct. 2448, 2463 (2018) ("We have held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'") (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)); *see also W. Va. Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or *force citizens to confess by word or act their faith therein*.") (emphasis added).

139.    Third, SB 5599 chills parents' speech.

140.    Plaintiffs have no adequate remedy at law.

141.    The actions Defendants are now effectively required and allowed to take violate the U.S. Constitution, specifically by posing a substantial threat to Plaintiffs' rights to freely express their views on these issues and to refrain from speech that contradicts the State's preferred views. Absent injunctive relief, Defendants' actions continue to threaten to harm Plaintiffs.

**E.    Count V: Federal Equal Protection Clause; U.S. Const. Amend. XIV, § 1, Cl. 4.**

142.    Plaintiffs hereby incorporate the allegations made in each preceding paragraph of this Complaint as if fully set forth herein.

143.    The Equal Protection Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1, cl. 4, guarantees Plaintiffs equal protection of the laws, "which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

144.    Strict scrutiny applies "when the classification impermissibly interferes with the exercise of a fundamental right." *Halet*, 672 F.2d at 1310.

145.    Before SB 5599, Wash. Rev. Code § 13.32A.082(3) generally allowed every parent to be notified of the location and condition of a child who is taken in by a homeless shelter. The previous version of Subsection 3 allowed that information to be withheld only if there is a compelling reason to do so, which includes circumstances indicating traditional abuse or neglect and requiring an individualized inquiry.

146.    However, SB 5599 amends Subsection 3 to say that if a child claims to be seeking "gender-affirming" treatment—and only for that reason—then "compelling reasons" under Washington law are per se established.

147.    SB 5599 thereby treats parents of children seeking or receiving "gender-affirming" treatment categorically differently from other parents, dividing parents into two classes drawn on lines that implicate fundamental rights to the upbringing and custody of their children, and for

Complaint - 26
*IPEC v. Inslee*, No. 3:23-cv-5736

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1   some parents, the fundamental free exercise right to raise their children according to the parents'

2   faith.

3       148.    This unequal treatment, therefore, triggers strict scrutiny.

4       149.    Indeed, singling out only parents of children claiming to be undergoing or seeking

5   "gender-affirming" treatment is irrational. That is because, among other things, the treatment

6   their children are seeking or receiving unconnected to parental behavior is irrational, and, as such,

7   would fail any level of scrutiny under the Equal Protection Clause, including the minimal standard

8   of rational-basis review.

9       150.    A majority of the legislature has legislatively punished parents who are not fully

10  onboard with so-called "gender-affirming treatment." Singling them out for disparate treatment

11  without evidence of abuse or neglect thus violates even rational basis review. *See U.S. Dep't of*

12  *Agric. v. Moreno*, 413 U.S. 528, 534 (1973) ("For if the constitutional conception of 'equal

13  protection of the laws' means anything, it must at the very least mean that a bare congressional

14  desire to harm a politically unpopular group cannot constitute a legitimate governmental

15  interest.").

16      151.    Plaintiffs have no adequate remedy at law.

17      152.    The actions Defendants are now required to take violate the U.S. Constitution,

18  specifically by posing a substantial threat to Plaintiffs' right to equal protection on a matter

19  implicating those parents' fundamental rights. Absent injunctive relief, Defendants' actions

20  continue to threaten to harm Plaintiffs.

21  **F.      Count VI: Federal Due Process Clause—Deprivation of Parental and Religious**

22  **Rights Without Procedural Due Process; U.S. Const. Amend. XIV, § 1, Cl. 3.**

23      153.    Plaintiffs hereby incorporate the allegations made in each preceding paragraph of

24  this Complaint as if fully set forth herein.

25      154.    The Due Process Clause of the Fourteenth Amendment guarantees that no State

26  shall "deprive any person of life, liberty, or property without due process of law." U.S. Const.

27  amend. XIV, § 1, cl. 3.

155. Plaintiffs' fundamental rights are implicated here.

156. When due process is implicated, "the question remains what process is due." *FDIC v. Mallen*, 486 U.S. 230, 240 (1988) (internal quotation marks omitted). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted).

157. Generally, the Due Process Clause ensures a fair hearing by an unbiased decision maker. *See, e.g., Morrissey v. Brewer*, 408 U.S. 471, 489 (1972). Here, however, parents of children who claim to be receiving or seeking certain treatment are immediately deprived of their rights to direct the upbringing of their children or to raise children in the parents' faith tradition with no process whatsoever.

158. Even for accusations of domestic violence or severe substance abuse, Subsection 3 provides due process by allowing for an individualized assessment to see if there is a compelling reason to withhold information about the child's whereabouts from the parents. But for parents of children seeking "gender-affirming treatment," there is not even a minimal procedure to provide due process. This lack of even minimal process is a violation of due process.

159. Plaintiffs have no adequate remedy at law.

160. The actions Defendants are now required or allowed to take violate the U.S. Constitution, specifically by posing a substantial threat to Plaintiffs' right not to be deprived of any liberty interest without due process of law. Absent injunctive relief, Defendants' actions continue to threaten to harm Plaintiffs.

**G.   Count VII: Federal Due Process Clause—Void for Vagueness; U.S. Const. Amend. XIV, § 1, Cl. 3.**

161. Due process requires "that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Fox Television*, 567 U.S. at 253. A statute falls short of this standard when its terms are "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Id.* (internal quotation marks

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

omitted). All Washington parents "are entitled to be informed as to what the State commands or forbids." *Id.* (internal quotation marks omitted).

162.    It is not entirely clear whether the provision in SB 5599 regarding reconciliation and reunification services allows the Department or a provider to condition such reconciliation or reunification on the parents agreeing to call a transgender child by the child's preferred name or pronouns, or agree to allow the child to receive treatment that the child needs parental permission for but that the parents oppose.

163.    To the extent SB 5599 is not clear in that regard, it is void for vagueness.

164.    Plaintiffs have no adequate remedy at law.

165.    The actions Defendants are now required to take violate federal law, specifically by posing a substantial threat to Plaintiffs' right not to be deprived of any liberty interest without due process of law. Absent injunctive relief, Defendants' actions continue to threaten to harm Plaintiffs.

**H.    Count VIII: Washington Due Process Clause—Parents' Right to Rear their Children Without State Interference; Wash. Const. Art. I, § 3.**

166.    Plaintiffs hereby incorporate the allegations made in each preceding paragraph of this Complaint as if fully set forth herein.

167.    Under the Washington Constitution, "No person shall be deprived of life, liberty, or property, without due process of law." Wash. Const. Art. I, § 3.

168.    In the context of parental rights, the Washington Supreme Court has observed that "[t]he family entity is the core element upon which modern civilization is founded." *In re Custody of Smith*, 969 P.2d 21, 28 (Wash. 1998), aff'd sub nom. *Troxel v. Granville*, 530 U.S. 57. And "parents[] . . . primarily have the constitutional right to the custody and control of such minor children." *In re Brown*, 105 P.3d 991, 994 (Wash. 2005) (internal quotation marks omitted); *see also In re Custody of B.M.H.*, 315 P.3d 470, 475 (Wash. 2013) ("[I]n . . . child custody disputes we afford considerable deference to parents . . . .").

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

169.    Thus, because "[a] parent's constitutionally protected right to rear his or her children without state interference[] . . . [is] as a fundamental 'liberty' interest," "state interference is justified only if the state can show that it has a compelling interest and such interference is narrowly drawn to meet only the compelling state interest involved." *In re Custody of Smith*, 969 P.2d at 28; *see also In re Custody of Shields*, 136 P.3d 117, 126 (Wash. 2006) ("[S]tate interference with a fit parent's fundamental right to autonomy in child-rearing decisions is subject to strict scrutiny.").

170.    The Defendants cannot satisfy strict scrutiny here. First, there cannot be a compelling government interest to deprive parents of their constitutional parental rights just because their child is receiving or seeking to receive "gender-affirming" care and shows up at a homeless shelter or host home. There is no connection to the parents' behavior, and the State cannot have a compelling interest in displacing a parent unrelated to the parent's conduct or condition.

171.    Second, for the same reasons, SB 5599 is not narrowly tailored. It is overinclusive, sweeping in parents who are not neglectful or abusive into its net. If the law is concerned about problematic parents, then the law could be more narrowly tailored, as evidenced by the previous iteration where "compelling reasons" was defined to capture abusive or neglectful parents.

172.    SB 5599 thus violates Plaintiffs' parental rights under the Washington Constitution.

173.    Plaintiffs have no adequate remedy at law.

174.    The actions Defendants are now required to take violate state law, specifically by posing a substantial threat to Plaintiffs' right not to be deprived of any liberty interest without due process of law. Absent injunctive relief, Defendants' actions continue to threaten to harm Plaintiffs.

I.    **Count IX: Washington Special Privileges and Immunities Clause; Wash. Const. Art. I, § 12.**

175.    Plaintiffs hereby incorporate the allegations made in each preceding paragraph of this Complaint as if fully set forth herein.

176.    The Washington Constitution states, "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." Wash. Const. Art. I, § 12.

177.    The Washington Supreme Court has "construed article I, section 12 of the Washington Constitution to be consistent with the equal protection clause of the Fourteenth Amendment." *Wash. Food Indus. Ass'n & Maplebear, Inc. v. City of Seattle*, 524 P.3d 181, 195 (Wash. 2023) (citing *Ockletree v. Franciscan Health Sys.*, 317 P.3d 1009, 1013-14 (Wash. 2014)).

178.    However, "[t]he article I, section 12 reasonable ground test is more exacting than rational basis review." *Schroeder v. Weighall*, 316 P.3d 482, 486 (Wash. 2014). "Under the reasonable ground test a court will not hypothesize facts to justify a legislative distinction." *Id.* "Rather, the court will scrutinize the legislative distinction to determine whether it in fact serves the legislature's stated goal." *Id.*

179.    The reasonable ground test is not satisfied here: because by lumping all parents of children who show up at shelters demanding or receiving "gender-affirming" treatment into one category, there is a mismatch between the legislature's goal of helping children who are being mistreated by their parents and the parents covered by the law. And the law makes no attempt to sort these parents into different groups for differing treatment.

180.    The law thus does not serve the legislature's stated goal because it will separate children from parents when there is no need. SB 5599, therefore, violates Article I, Section 12 of the Washington Constitution.

181.    Plaintiffs have no adequate remedy at law.

182.    The actions Defendants are now required to take violate state law, specifically by posing a substantial threat to Plaintiffs' right not to be deprived of any liberty interest without due process of law. Absent injunctive relief, Defendants' actions continue to threaten to harm Plaintiffs.

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

**J.      Count X: Washington Free Speech Clause; Wash. Const. Art. I, § 5.**

183.    Plaintiffs hereby incorporate the allegations made in each preceding paragraph of this Complaint as if fully set forth herein.

184.    The Washington Constitution declares, "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." Wash. Const. Art. I, § 5.

185.    The clause provides that "parents have a right to determine the manner in which delicate moral issues will be discussed with their young children." *Bering v. SHARE*, 721 P.2d 918, 937 (Wash. 1986); *see also id.* ("The parents' right to direct the rearing of their children clearly is deserving of the State's protection.").

186.    SB 5599 violates this clause of the Washington Constitution by violating parents' rights to teach and discuss the "delicate moral issues" surrounding gender identity. It does so in two ways.

187.    First, it chills parental speech both before a child runs away, when the parent is trying to get the child back, and after the child has been returned. SB 5599 will force parents to avoid any speech that their child or the State may disagree with, such as using the child's biological pronouns and birth name, or affirming the child's chosen gender identity.

188.    Second, SB 5599 compels parents to engage in speech contrary to the parents' views on "delicate moral issues" that align with their child and the State's views.

189.    SB 5599 does all this by creating a legal environment wherein if the parent does not do what the child wants, the child can just run away and get the state to provide what the child desires. And once that has occurred, for the parents to convince the State to reunify the child with them, the parents must confirm through their speech the State's views on gender identity and avoid saying anything to their child with which the State disagrees.

190.    Thus, SB 5599 violates Article I, Section 5 of the Washington Constitution.

191.    Plaintiffs have no adequate remedy at law.

192.    The actions Defendants are now required to take violate state law, specifically by posing a substantial threat to Plaintiffs' right not to be deprived of any liberty interest without due

process of law. Absent injunctive relief, Defendants' actions continue to threaten to harm Plaintiffs.

## VI. Prayer For Relief.

Wherefore, Plaintiffs request that the Court issue an order and judgment:

193. Declaring that under Count I, the threatened denial by Defendants pursuant to SB5599 of Plaintiffs' right to direct the upbringing of their children violates the federal Due Process Clause of the Fourteenth Amendment.

194. Declaring that under Count II, the threatened denial by Defendants pursuant to SB5599 of Plaintiffs' right to the custody of their children, and the consequent ability to keep their family together, violates the federal Due Process Clause of the Fourteenth Amendment;

195. Declaring that under Count III, the threatened denial by Defendants pursuant to SB5599 of Plaintiffs' right to raise their children according to the parents' faith violates the federal Free Exercise Clause of the First Amendment as applicable to the States through the Fourteenth Amendment;

196. Declaring that under Count IV, the threatened denial by Defendants pursuant to SB5599 of Plaintiffs' rights to express to their children and others their views regarding gender identity violates the federal Free Speech Clause of the First Amendment as applicable to the States through the Fourteenth Amendment;

197. Declaring that under Count V, the threatened denial by Defendants pursuant to SB5599 of Plaintiffs' right to equal protection violates the federal Equal Protection Clause of the Fourteenth Amendment;

198. Declaring that under Count VI, the threatened denial by Defendants pursuant to SB5599 of Plaintiffs' right not to be deprived of their liberty interests in raising their children violates the federal Due Process Clause of the Fourteenth Amendment;

199. Declaring that under Count VII, the threatened denial by Defendants pursuant to SB5599 of Plaintiffs' right to have adequate notice of what the law commands or forbids leads to the result that SB 5599 is void for vagueness and thus violates the federal Due Process Clause;

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1    200.   Enjoining Defendants through a preliminary injunction, to be succeeded by a
2  permanent injunction, from enforcing the challenged provisions of SB 5599;

3    201.   Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and
4  other applicable laws; and

5    202.   Granting any other relief the Court deems just, proper, and appropriate.

6

7  ///

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1 | August 16, 2023.

| | |
|---|---|
| 2 | Ard Law Group PLLC |
| 3 | |
| 4 | |
| 5 | By: _____ |
| 6 | Joel B. Ard, WSBA # 40104 |
| 7 | P.O. Box 11633 |
| 8 | Bainbridge Island, WA 98110 |
|   | 206.701.9243 |
|   | Joel@Ard.law |
| 9 | Attorneys For Plaintiffs |

Schaerr | Jaffe LLP

By: */s/ Gene Schaerr*

Gene Schaerr (PHV forthcoming)
1717 K Street NW, Suite 900
Washington, DC. 20006
(2020) 787-1060
gschaerr@schaerr-jaffe.com
Attorneys For Plaintiffs

America First Legal Foundation

By: */s/ Reed D. Rubinstein*

Reed D. Rubinstein (PHV forthcoming)
reed.rubinstein@aflegal.org

By: */s/ Nicholas Barry*

Nicholas Barry (PHV forthcoming)
nicholas.barry@aflegal.org

By: */s/ Ian Prior*

Ian Prior (PHV forthcoming)
ian.prior@aflegal.org

By: */s/ James Rogers*

James Rogers (pro hac vice forthcoming)
james.rogers@aflegal.org

611 Pennsylvania Avenue S.E. No. 231
Washington, D.C. 20003
(202) 964-3721
Attorneys For Plaintiffs

Complaint

*IPEC v. Inslee*, No. 3:23-cv-5736

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243