**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| INTERNATIONAL PARTNERS FOR ETHICAL CARE INC; ADVOCATES PROTECTING CHILDREN; PARENT 1A; PARENT 1B; PARENT 2A; PARENT 2B; PARENT 3A; PARENT 3B; PARENT 4A; PARENT 4B; PARENT 5A; PARENT 5B, | No. 24-3661 |
| | D.C. No. 3:23-cv-05736-DGE |
| *Plaintiffs - Appellants*, | |
| v. | ORDER |
| ROBERT FERGUSON, Governor; NICK BROWN, Attorney General of Washington; TANA SENN, Secretary of the Washington Department of Children, Youth, and Families, | |
| *Defendants - Appellees*. | |

Filed December 5, 2025

Before: Sidney R. Thomas, Milan D. Smith, Jr., and Daniel
A. Bress, Circuit Judges.

Order;
Dissent by Judge VanDyke;
Dissent by Judge Tung

## SUMMARY[*]

### Article III Standing

The panel denied a petition for panel rehearing and a petition for rehearing en banc in a case in which the panel affirmed the district court's dismissal, for lack of Article III standing, of a challenge to three Washington laws regulating the rights and privileges of Washington minors seeking access to mental health care and shelter services, particularly minors who are transgender.

Dissenting from the denial of rehearing en banc, Judge VanDyke, joined by Judge Bumatay, stated that Washington's legal regime governing the treatment of gender dysphoria infringes on the plaintiff parents' right to direct the care and upbringing of their children.  Plaintiffs plausibly allege an unconstitutional interference with their fundamental right to parent, and the panel's decision to the contrary narrows the parental right unjustly—creating a clean split with the Fifth Circuit in the process.

Dissenting from the denial of rehearing en banc, Judge Tung, joined by Judges Bumatay and VanDyke, stated that the facts, as alleged in the complaint, should have been more

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

than enough to establish standing.  The parents alleged that Washington law poses a substantial risk of harm to their ability to direct the upbringing of their children and that the law violates their constitutional rights.  In concluding that the parents' allegations were insufficient to state an injury-in-fact, the panel runs afoul of Supreme Court and Ninth Circuit jurisprudence governing standing, improperly construes the parents' complaint in the light most disfavorable to them, and is inconsistent with the holdings of other circuits.

---

### ORDER

The panel voted to deny the petition for panel rehearing. Judge M. Smith and Judge Bress voted to deny the petition for rehearing en banc, and Judge S.R. Thomas so recommended.

The full court was advised of the petition for rehearing en banc.  A judge requested a vote on whether to rehear the matter en banc.  The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration.  Fed. R. App. P. 40.  The petition for panel rehearing and the petition for rehearing en banc are **DENIED.**

VANDYKE, Circuit Judge, joined by BUMATAY, Circuit Judge, dissenting from the denial of rehearing en banc:

Time and again, the Supreme Court has reminded lower courts that "the interest of parents in the care, custody, and control of their children" sits among "the oldest of the fundamental liberty interests" recognized in our Nation. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.). Wherever the outer bounds of that right may lie, the Supreme Court has not been shy in insisting that "the state can neither supply nor hinder" the "cardinal" role of fit parents in "the custody, care and nurture of the child." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). This case teaches that apparently the state can, so long as it keeps parents in the dark about what it's doing.

Washington's legal regime governing gender-confused children now empowers its state-run shelters to hide minors from parents and to encourage them to travel further down the path of gender ideology—all while hiding from fit parents what the state or other actors do in those shelters. That odious framework inverts the age-old, common-sense principle that parents—not the state and certainly not the child—hold primacy over the parent–child relationship.

The panel opinion doesn't dispute this basic point and— one hopes—would not attempt to uphold Washington's legal regime if it squarely addressed it. But its holding that parents aren't even harmed by this state of affairs presents a no less extreme position and one that departs from both our sister circuit and Supreme Court guidance. Under its rationale, Washington doesn't harm any parent until the moment that it gets caught secretly subjecting a child to so-called gender transition services—something that parents might never know until it's too late. Such a reductionist view of parental

rights mistakes parental authority for a mere property interest in the physical possession of a child—a view long rejected by our court and others.

The parents in this case have plausibly alleged that they cannot counsel their gender-confused children in the way they see fit, lest those children, prompted by Washington's novel law, leave home for a state-run shelter that will help them undergo transition procedures in secret. Washington's legal regime therefore chills the rights of these parents to direct the care and upbringing of their children, strikes at the heart of what the parental right protects, and constitutes a current and ongoing invasion of the parents' constitutional rights.

By denying rehearing en banc, our court missed an opportunity to correct the panel's erroneous view that parents only have an interest in the physical custody of their children. Our failure to do so is particularly troubling here where our court had a unique and well-presented opportunity to weigh in on a clear collision between gender ideology and parental rights. Without rehearing, our court now joins a growing crowd of lower courts that appear to have made every effort to avoid addressing a constitutional confrontation occurring all across our Nation. *See Lee v. Poudre Sch. Dist. R-1*, No. 25-89, 2025 WL 2906469, at \*1 (U.S. Oct. 14, 2025) (Alito, J., concurring in the denial of certiorari) ("But I remain concerned that some federal courts are 'tempt[ed]' to avoid confronting a 'particularly contentious constitutional questio[n.]'") (alterations in original). The plaintiffs plausibly allege an unconstitutional interference with their fundamental right to parent, and our court should have reheard this case and recognized that they have alleged sufficient injury to confer standing.   I respectfully dissent from our failure to do so.

## I.

This case arises from Washington's regulatory regime, which—through a series of amendments and a patchwork of interacting statutes—now systematically facilitates the covert transitioning of children without parental knowledge or consent.  In 1985, Washington enacted a series of laws to "ensure that minors in need of mental health care and treatment receive appropriate care and treatment." 1985 Wash. Sess. Laws, ch. 354, § 1.  Those laws ensured that minors 13 years and older could receive outpatient health treatment without the consent of their parents.  Wash. Rev. Code § 71.34.530.

But Washington, for decades, did not allow that treatment to happen in secret.  Instead, whenever a shelter learned that a "child [wa]s away from a lawfully prescribed residence or home without parental permission," that shelter was required by law to contact the child's parents within 72 hours.  Wash. Rev. Code § 13.32A.082(1)(b)(i).  The only exception to this general rule was "[i]f there [were] compelling reasons not to notify the parent" of the child's presence at the shelter.  *Id.*  And those "compelling reasons" were, predictably, only those circumstances where "notifying the parent or legal guardian [would] subject the minor to abuse or neglect."  *Id.* § 13.32A.082(2)(c).  That changed in 2023 when Washington amended its parental notification statute.  2023 Wash. Legis. Serv., ch. 408, § 2. While the parental notification statute still generally requires parental notification "within 72 hours" of the minor leaving home for health treatment, the "compelling reasons" exception was expanded to include any scenario where "a minor is seeking or receiving protected health care services," which includes so-called "gender-affirming treatment." Wash. Rev. Code § 13.32A.082(2)(c)(ii).  That amendment

now treats the parents of children suffering from gender dysphoria as per se neglectful or abusive and does not require the shelter to contact them.[1]

What's worse, even if the shelter does contact a minor's parents to inform them that a child has run away from home, Washington law still requires it "to make referrals on behalf of the minor for appropriate behavioral health services"—meaning services intended to transition that child to a different gender. *Id.* § 13.32A.082(3).

A group of plaintiffs—Washington parents with children suffering from gender dysphoria—and two aligned organizational plaintiffs sued to enjoin this regulatory regime. Relevant here, two sets of parents—1A and 1B, alongside 2A and 2B—alleged that Washington's legal regime has interfered with their ability to parent their children as they see fit. Both sets of parents have children who have expressed confusion about their gender, including a desire to transition to a different gender. Both sets of parents also believe that it is in the best interest of their children to raise them in conformity with their biological sex. But unlike most parents, these parents have to navigate this disagreement with the full knowledge that, at any moment, their children can veto their decisions about gender and leave home for a state-run shelter to begin transitioning in secret. That possibility understandably has changed the behavior of these parents who, as a result, have declined to discuss issues of gender with their children, inculcate their views about gender identity, or address their children's

---

[1] The Complaint and Petition for Rehearing En Banc both refer to these children as experiencing "gender confusion" or "gender dysphoria." Consistent with the plaintiffs' pleadings and the motion-to-dismiss stage of this case, this dissent adopts that terminology.

gender dysphoria consistent with the parents' beliefs. These parents alleged that their First and Fourteenth Amendment rights had been violated by Washington and sued to enjoin the relevant statutes.

But the district court dismissed the plaintiffs' claims as too speculative, holding that the parents failed to allege that Washington's legal regime had actually harmed them. Instead, the district court concluded that the allegations rested on "speculation and conjecture" and dismissed the case for lack of standing.  A panel of our court agreed, holding that the parents complained of "[d]amages 'inflicted by [their] own hand.'"  Such a decision enervates the well-established right of parents to direct the care and upbringing of their children, and perversely encourages states to be clandestine when intentionally interfering with such rights.

## II.

It is well established that parents have the right and duty to direct the care and upbringing of their minor children. This right extends beyond just a mere liberty interest in the custody of their children but also protects the parent–child relationship from infringement by state actors.

Washington's legal regime intentionally infringes on that relationship by granting minor children a veto over their parents' decisions on gender and gender identity.  Parents cannot be free—and as alleged by plaintiffs, are not free— to inculcate their children with traditional views of gender so long as Washington creates a system facilitating the transition of those children without their parents' involvement and against their parents' wishes.

Our court erred in concluding otherwise.  In doing so, our cursory holding splits with the Fifth Circuit's far more

rigorous analysis on the scope of parental rights. The panel's decision goes too far in cabining parental rights, and the full court should have corrected that error. Washington's legal regime not only infringes on parental rights but, as the Fifth Circuit explained, effectively debilitates them.

This case presented an ideal opportunity to confront the ongoing and intensifying conflict between longstanding conceptions of parental rights and the ever-growing encroachment of state actors with a particular view of gender ideology. And because it is relatively free of the complicating factual issues that often accompany school gender ideology cases, this case would have allowed for both an authoritative ruling on a contentious constitutional issue and much-needed guidance to lower courts.

**A.**

The Supreme Court has long held "that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince*, 321 U.S. at 166. This parental right to direct the care and upbringing of children preexists our own constitutional order and flows from the "natural bonds of affection" that "lead parents to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979); *see also* 1 William Blackstone, *Commentaries on the Laws of England* \*447 (1753) ("Providence has … implant[ed] in the breast of every parent that natural … affection, which not even the deformity of person or mind … can totally suppress.").

It is also well settled that the parental right over children includes "a 'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Parham*, 442 U.S. at 602. It would be plainly illegal for Washington to subject a

minor child to medical procedures without parental consent under our precedent. *See Mann v. County of San Diego*, 907 F.3d 1154, 1160–61 (9th Cir. 2018) (holding that the state may not perform medical examinations on children without parental notification and consent or judicial authorization). But because Washington has not yet used its state-run shelters to start transitioning a plaintiff's child—or at least we don't know that it has—the panel held that no parent could allege a harm sufficient to confer standing.

That decision misunderstands the nature and contours of parental rights. Centuries of American and English tradition recognize that fit parents hold a near-absolute right to make decisions about the care and upbringing of their children, free from state interference. *See Troxel*, 530 U.S. at 65 (plurality opinion) ("[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."). Parental rights encompass more than a bar against the state removing a child from the home. *See Hardwick v. Cnty. of Orange*, 980 F.3d 733, 741 (9th Cir. 2020) (noting the parental right encompasses both the right to companionship of children and the right in raising those children). Rather "*the relationship* between parent and child is constitutionally protected," which "the state can … no[t] hinder." *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (emphasis added). This relationship extends beyond mere custody of a child, but also encompasses choices broadly implicated in a parental duty to direct the upbringing and preparation of the child for life's future obligations. *See Troxel*, 530 U.S. at 65–66 (collecting cases); *see also Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987) (holding that the "constitutional interest in familial companionship and society logically extends to protect

children from unwarranted state interference with their relationships with their parents"), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (1999); *Michael H. v. Gerald D.*, 491 U.S. 110, 142 (1989) (Brennan, J., dissenting) ("Where the interest under consideration is a parent-child relationship, we need not ask, over and over again, whether that interest is one that society traditionally protects.").

## B.

Washington's new statutory scheme strikes at the heart of this parental right and, as alleged by plaintiffs, chills the fundamental right of Washington parents to direct the care and upbringing of their children. Parents 1A and 1B, for example, are parents to a gender-confused daughter, who began expressing gender dysphoria at a Washington public school. The public school encouraged the daughter to "socially transition" and present as a boy without notifying the parents. Although the parents removed their daughter from the school after discovering what happened, Washington's statutory framework governing runaway children still instills reasonable fear in 1A and 1B. And that fear—that their daughter could run away for a state-run gender transition facility—has understandably chilled their approach to parenting. As alleged by 1A and 1B, the parents have hesitated to discipline their daughter from a reasonable concern that doing so would incentivize her to run away and transition without parental consent.

Parents 2A and 2B also altered their parenting in reaction to Washington's regulatory scheme. Those parents have two gender confused daughters, one eighteen years old and one who is thirteen. Both daughters have accused the parents of being "transphobic" for refusing to affirm the daughters'

transgender beliefs, and the older sister has explicitly threatened to take her younger sister to a "safe place" where her transgender identity will be affirmed. In the face of this threat, and with the knowledge that Washington law facilitates carrying out the threat, the parents now decline to refer to their daughter by her given name, don't use any pronouns when describing her, and refuse to inculcate the parents' values and beliefs about gender at all when around her.

It is difficult to see how these parents, who allege that they cannot raise their children as they see fit because of Washington's regulatory scheme, have not been harmed in a manner sufficient to confer standing. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("An injury in fact can be a physical injury, a monetary injury, … or an injury to one's constitutional rights, to take just a few common examples."). The very existence of a state regulatory regime that encourages and facilitates the transition of children without the consent of their parents presently interferes with the protected parent–child relationship by subverting a parent's authority to direct the upbringing of her child. The plaintiffs have alleged exactly that and have been injured by Washington's statutes.

## C.

The panel nonetheless concluded that these constraints on parenting do not arise to the level of concrete and particularized harm. In doing so, it fundamentally misunderstood the nature of parental rights by concluding that the plaintiff parents have only alleged "self-inflicted injuries" in describing how Washington's legal regime has chilled and interfered with their parenting. In the panel's view, the parents cannot show standing until the moment that

"their children's behavior has … brought them within the reach of the Statutes." "[W]ithin the reach of the Statutes" presumably means that Washington must first hide a gender-confused child from their parents before a parent may sue.

But the real harm to parents from Washington's legal regime happens long before a child runs away. Such an intentional interference with the parent–child relationship, be it direct or indirect, creates an injury to the fundamental right to parent. *See, e.g.*, *Troxel*, 530 U.S. at 75 ("[T]he burden of litigating a domestic relations proceeding can itself be so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated.") (internal quotations omitted); *see also City of Huntington Beach v. Newsom*, 2025 WL 1720210, at *6 (C.D. Cal. June 16, 2025) (finding injury where "parents and children are at odds with each other regarding how to address … gender identity issues, resulting in difficulties parenting the children in the manner the parents want to raise them"); *City of Fontana*, 818 F.2d at 1418 (identifying "the many times the Supreme Court has interpreted the due process clause to protect the interests of parents in maintaining a relationship with their children" (simplified) and describing *Kelson v. City of Springfield*, 767 F.2d 651 (9th Cir. 1985), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986), as holding that "a parent has a constitutionally protected liberty interest in the companionship and society of his or her child").

The Fifth Circuit carefully explained this point just a few years ago in *Deanda v. Becerra*, 96 F. 4th 750 (5th Cir. 2024). There a parent (Deanda) sued the Secretary of Health and Human Services over the implementation of Title X, which funded programs that offered contraceptives to

minors without parental consent. *Id.* at 754–55. Deanda sought to raise his children under a traditional Christian worldview, which includes a belief in abstaining from pre-martial sexual relations. *Id.* at 754. He argued that the Secretary's funding of any program that offered contraceptives to children without parental consent violated "his constitutional right to direct his children's upbringing." *Id.* at 755.

Deanda never alleged that any child of his had actually received contraceptives under these programs or even, as the plaintiffs here allege in detail, that his children were at a heightened risk of availing themselves of that program. *Id.* at 758. And the Secretary made the same argument against standing that the panel adopted in this case: that since Deanda never alleged that his children took advantage of the contraception program, it did not injure him. *Id.*

The Fifth Circuit properly rejected that view as "a puzzling argument," holding that Deanda's "parental right[] to notice and consent" was invaded by the mere existence of the state-run program that provided contraceptives to minors without informing parents or obtaining their consent. *Id.* at 759. As the court explained, the program acted to "nullify[] [Deanda's] parental rights" by creating a workaround to parental consent. *Id.* at 760. That conferred standing for Deanda "because the Secretary [sought] to preempt his … right to consent to his children's obtaining contraceptives." *Id.*[2]

---

[2] The Fifth Circuit considered Deanda's right in the context of "his state-conferred right" to direct the care and upbringing of his children. *Deanda*, 96 F.4th at 760. But I don't read *Deanda*'s analysis as dependent on that state right since, unless that state right mapped onto the federal parental right, the Fifth Circuit could not have held that it

*Deanda*'s reasoning maps neatly onto this case. There's no reasonable dispute that Washington's legal regime intentionally allows for and encourages minors to seek and obtain gender transition services over the objections of fit parents. There's also no reasonable dispute that fit parents have a constitutional right to make major health decisions on behalf of their minor children. So just like Title X's contraceptive distribution program, Washington's legal regime does "not merely 'inva[de]' [plaintiffs'] parental rights …. [i]t w[ill] obliterate them." *Deanda*, 96 F.4th at 757 (first alteration in original) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).

I wonder if my colleagues would fault these parents for complaining of "[d]amages 'inflicted by [their] own hand'" if this case involved injuries that were not yet so strongly championed by political actors in Washington. For now, Washington law defines "protected healthcare services" as so-called "gender-affirming treatment," which excuses these shelters from notifying parents that their children are receiving these procedures. 2023 Wash. Legis. Serv., ch. 408, § 13.32A.082(2)(c)(ii). But what if Washington expanded that definition to include "Medical Assistance in Dying" among the "protected healthcare services"? When exactly would the panel concede that the parental right was implicated by a state-run, assisted-suicide-in-secret program? Would parents of a suicidal teenager who threatened to run away have standing to sue? What if these parents lived in fear that their child would commit suicide at

---

preempted Title X's regulations. *See id.* at 768 (enjoining the implementation of Title X); *see also United States v. Missouri*, 114 F.4th 980, 986 (8th Cir. 2024), *cert. denied*, No. 24-796, 2025 WL 2823708 (U.S. Oct. 6, 2025) ("[A] State cannot invalidate federal law to itself.").

this state-run shelter without their involvement and accordingly altered their parenting style to discourage that from happening?**3**  Following its logic in this case, the panel would hold that the parents haven't actually been injured until "their children's behavior has … brought them within the reach of the Statutes," and that any pain involved in avoiding that outcome is merely self-inflicted.  Is our court's position really that, in such a hypothetical, a parent must first have a dead child before it could sue?  If not, then why must *these* parents first have a secretly transitioning child before suing?  And what a perverse incentive we have now created in parental rights cases: only those parents willing to first subject their child to irreparable injury can ever have their day in court.

Our court's holding is as unworkable as it is illogical.  So long as Washington encourages minors to take the plunge into gender transitions without the knowledge (or even over the objection) of fit parents, parents lose their ability to direct the care and upbringing of their children, regardless of whether § 13.32A.082(2)(c)(ii)'s sword of Damocles ever falls on that particular parent.  The Fifth Circuit got this right and our own court has tragically erred.

**D.**

Unfortunately, today's confrontation isn't unique. Differing "approaches to parental rights are increasingly clashing in courtrooms as parents challenge attempts by state

---

[3] It's not difficult to come up with examples of how this might work. Parents could decide that their child could never leave the house unsupervised, preventing him from attending school sports events, spending time with friends, or even attending prom—all healthy parts of a child's development that parents might reasonably forbid due to the heightened risks that would accompany such a hypothetical legal regime.

actors to substitute the state's judgment for that of parents with respect to children struggling with gender identity." Ryan Bangert, *Parental Rights in the Age of Gender Ideology*, 27 Tex. Rev. L. & Pol. 715, 724 (2023). With 6,000 public schools estimated to have procedures in place facilitating the secret transition of children against their parents' wishes, courts cannot continue to dodge this growing conflict between gender identity and parental rights indefinitely. *See Poudre Sch. Dist. R-1*, 2025 WL 2906469, at \*1 (Alito, J., concurring in the denial of certiorari). Our court will need to weigh in on this "question of great and growing national importance" soon, and this case presented an ideal opportunity to do so. *Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist., Wisconsin*, 145 S. Ct. 14 (2024) (Alito, J., dissenting in the denial of certiorari).

Although public education is probably the environment where gender ideology most often runs up against parental rights, that setting presents unique and fact-specific considerations that have made appellate review challenging to obtain. For example, *how* a school implements its guidance on gender ideology appears to matter a great deal to our sister circuits. *See Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist., Wisconsin*, 95 F.4th 501, 505–06 (7th Cir.), *cert. denied*, 145 S. Ct. 14 (2024) ("All we have before us is a policy on paper without concrete facts about its implementation."); *Lee v. Poudre Sch. Dist. R-1*, 135 F.4th 924, 935 (10th Cir. 2025), *cert. denied*, No. 25-89, 2025 WL 2906469 (U.S. Oct. 14, 2025) ("The parents don't explain how policies that presume the district knows better than parents, or that discourage disclosure, directly caused district staff to [harm the plaintiffs]."). That fact-specific inquiry often limits opportunities to squarely address a government's infringement on parental rights surrounding

gender ideology, since a plaintiff will remain unable to contest the factual findings about how a school policy is effectuated even if the court resolves constitutional questions about what rights parents have vis-à-vis gender ideology. *See Poudre Sch. Dist. R-1*, 2025 WL 2906469, at *1 (Alito, J., concurring in the denial of certiorari) (noting the plaintiff's failure to challenge the appellate court's dispositive holding that they had not plausibly alleged municipal liability).

This case presents no such issues. The plaintiffs plausibly allege that their right to parent has been abridged by Washington's fixed statutory regime governing the treatment of runaway children experiencing gender dysphoria—allegations this court must accept as true at this stage of the proceedings. Their argument does not depend on the factual nuances of how a school implements its own informal guidance documents, which are subject to change at a moment's notice. Rather, the plaintiffs here sue to enjoin the operation of several statewide laws that Washington shelters are now obligated to follow. This court was well equipped to interpret those statutes, alongside state shelters' legal obligations under them, and to determine their interference with established parental rights. We should have taken the opportunity to do just that.

**E.**

Washington's legal regime governing the treatment of gender dysphoria infringes on the plaintiff parents' right to direct the care and upbringing of their children. Plaintiffs plausibly alleged that they are chilled in carrying out this constitutionally protected duty, and the panel's decision to the contrary narrows the parental right unjustly—creating a clean split with the Fifth Circuit in the process. Because the

panel erred in construing injury to parental rights too narrowly, the full court should have reheard this case to properly define and apply that right in this context.

I respectfully dissent.

---

TUNG, Circuit Judge, joined by BUMATAY and VANDYKE, Circuit Judges, dissenting from the denial of rehearing en banc:

This case is about whether parents with children who suffer from gender dysphoria and are at risk of running away have standing to challenge a Washington State law that would prohibit shelters from notifying parents of the location of their runaway child. The panel held that such parents lack standing. Respectfully, I disagree. In concluding that the parents' allegations were insufficient to state an injury-in-fact, the panel runs afoul of Supreme Court and Ninth Circuit jurisprudence governing standing, improperly construes the parents' complaint in the light most disfavorable to them, and is inconsistent with the holdings of other circuits. En banc review should have been granted to fix these errors.

**I.**

Under Washington law, when a licensed shelter takes in a runaway child, it usually must notify the parents immediately. *See* Wash. Rev. Code § 13.32A.082(1)(b)(i) (2024). A longstanding exception provides that a shelter is barred from notifying the parents if circumstances indicate abuse or neglect; in that case, the shelter must instead make a report to the State's Department of Children, Youth, and Families (the "Department"). *See id.* and § 13.32A.082(2)(c)(i) (2024).

But recently, the legislature added another exception: a shelter is prohibited from notifying the parents when the runaway child "is seeking or receiving . . . gender-affirming treatment." Wash. Rev. Code §§ 13.32A.082(2)(c)(ii) and 13.32A.082(2)(d) (2024); *see also* 1 ER 11 (Mot. to Dismiss) ("the shelter must contact [the Department] instead of contacting the youth's parents directly"). In the legislature's view, a child suffering from gender dysphoria must be "protected" from parents who do not seek "gender-affirming treatment" for their child and do not "affirm" the child's gender identity. State law thus places such parents, who wish to raise their child in accordance with the child's biological sex, in the same category as parents who are abusive or neglectful. Both categories of parents lose any entitlement to be notified of their runaway child's location.

State law restricts parental control in another way. Upon receipt of the shelter's report of the runaway child, the Department "shall" offer to make "referrals on behalf" of the child "for appropriate behavioral health services," *see* Wash. Rev. Code § 13.32A.082(3)(b)(i) (2024), which can include "gender-affirming" treatment. And all this, too, can occur without the parents' knowledge or consent. Indeed, the law appears designed to do just that—to prevent parents from reuniting with their child (unless they "affirm" the child's gender identification) and to clear the path of obstacles for the child to receive "gender-affirming" treatment.

## II.

Perhaps unsurprisingly, several concerned parents challenged this law. The individual plaintiffs here—including four sets of parents—have children who suffer from gender dysphoria. 1 ER 16, 18–19, 22. They do not believe it is healthy or consistent with their deeply held

convictions to "affirm" their child's gender identity contrary to the child's biological sex. 1 ER 16, 19, 23. They also fear that "gender-affirming" treatment could result in permanent bodily and psychological damage to their child. 1 ER 23.

Such views have caused divisions within the families here. The parents' children, defying their parents' beliefs, have threatened to run away—indeed, one child has already done so (about a year before the filing of the complaint) and another child has threatened to take a younger sibling to a "safe place" away from their parents. 1 ER 18, 22, 45. Having "socially transitioned," the children accuse their parents of being "transphobic" because the parents would not use their children's preferred pronouns. 1 ER 18, 22. Another child was encouraged "to run away" by a "friend's family" because the parents "did not believe that a 'trans identity' was authentic or healthy for him." 1 ER 20. The parents fear that the child's younger brother (who suffers from gender dysphoria too) will also run away and that, by dint of these statutes, they will lose control over their younger child's treatment. 1 ER 20–21.

## III.

All these facts, as alleged in the complaint, should have been more than enough to establish standing—and in several different ways. Standing requires an "injury in fact" that is "actual or imminent, not conjectural or hypothetical," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks omitted), and an injury is "imminent" if it is "certainly impending" or "there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation marks omitted); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013).

*First*, the parents' asserted injuries are "certainly impending"; at the very least, there is a "substantial risk" of harm. *Department of Commerce v. New York*, 588 U.S. 752, 767 (2019) (citation omitted). More specifically, there is a "substantial risk" that at least one child of the parents, having run away before, would run away to a shelter offering precisely the kind of "safe place" that would require concealment from parents. Once the child arrives at the shelter, and as a direct result of the challenged law, the parents would be kept in the dark as to their child's location and course of medical treatment—a clear interference with the parents' asserted constitutional right to direct the upbringing of their child.

The parents' concern that the State would displace their role as their child's guardians with respect to the proper treatment of gender dysphoria is plainly reasonable and far from speculative. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183–84 (2000) ("reasonable concerns" of harm are sufficient to show injury-in-fact); *Covington v. Jefferson Cnty.*, 358 F.3d 626, 639 (9th Cir. 2004) (same). The parents should not have to wait until their child has run away to a shelter and received life-altering treatment before they are afforded the opportunity to challenge the law—a law whose very object is to prevent the parents from knowing, in the first place, of their child's arrival at the shelter and his or her receipt of "gender-affirming" treatment. *See Harris v. Bd. of Supervisors, Los Angeles Cnty.*, 366 F.3d 754, 762 (9th Cir. 2004) (plaintiffs need not "wait until they suffer" injury to sue); *see also Mahmoud v. Taylor*, 606 U.S. 522, 559–60 (2025) (plaintiffs need not "wait and see" how a particular book is used in a particular classroom before suing); *Clapper*, 568 U.S. at 414 n.5 ("Our cases do not uniformly

require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about."). By that time, it may be too late to rehabilitate (in the parents' view) the damage done to their child. The requirements of standing are strict, but they are not cruel.

Injury-in-fact is readily apparent here. When the parents' gender-dysphoric children have called the parents "transphobic," have already "socially transitioned," have been encouraged by others to leave their parents, and have threatened to escape to a "safe place"—indeed, one of them has already run away before—the risk of at least one child's flight to a shelter that would interfere with the parents' right to direct the child's upbringing is substantial.

*Second*, the incentive that Washington law has created for gender-dysphoric children to run away to licensed shelters is also enough to confer standing. State law requires licensed shelters to withhold parental notification with respect to runaway children who are seeking or receiving "gender-affirming" treatment. Shelters instead must report to the Department, which in turn is obligated to offer referrals on behalf of minors for "gender-affirming" treatment. The law thus makes running away to those shelters attractive for children suffering from gender dysphoria and seeking "gender-affirming" treatment, and accordingly, produces an increased risk of harm to the parents of state interference with their child's upbringing. Combine that risk with the severity of the harm—potential irreparable damage wrought upon children by such treatment—and the parents have easily shown standing. *See, e.g.*, *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996) ("The more drastic the injury that government action makes more likely, the lesser the increment in probability necessary to establish standing.").

*Third*, as the objects of the challenged Washington law, the parents have standing to sue. "When a plaintiff is the 'object' of a government regulation, there should 'ordinarily' be 'little question' that the regulation causes injury to the plaintiff and that invalidating the regulation would redress the plaintiff's injuries." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025) (citing *Lujan*, 504 U.S. at 561); *see also Meland v. Weber*, 2 F.4th 838, 845 (9th Cir. 2021). That holds true here: Washington law deems parents who refuse to affirm their child's gender identity or support "gender-affirming" treatment as falling within the same category as parents who abuse or neglect their child (for purposes of the state's shelter laws). Washington law directs, as to such parents whose child runs away, that shelters withhold notice.

That the law regulates shelters directly (and not parents) does not render parents any less the objects of the law for purposes of standing: the law seeks to alter the parents' behavior by compelling them to "affirm" their child's gender identity, or suffer the consequences of not being able to reunite with their runaway child and participate in their child's treatment for gender dysphoria. *See Diamond Alt. Energy*, 606 U.S. at 115. Its object is to "protect" runaway children with gender dysphoria *from their parents* who might hinder their desired treatment. Those parents are the clear "targets" of the law. *Id.* at 125.

Each of these different ways of viewing the injuries is enough to establish standing. Together, they compel that conclusion.

## IV.

Unfortunately, the panel disregarded each of these points that go to establish standing and thus erred in holding that

the parents failed to allege it. In several ways, the panel's ruling contravenes Supreme Court and Ninth Circuit precedent and is inconsistent with the rulings of our sister circuits. This court should have granted en banc review to correct the panel's errors.

The panel contravenes Supreme Court and Ninth Circuit precedent by failing to properly analyze whether the facts as alleged created a "substantial risk that harm will occur" and whether the parents are the objects of the challenged law that would give rise to standing—nowhere does the panel opinion expressly acknowledge or apply these legal standards. *See Susan B. Anthony List*, 573 U.S. at 158 (2014) ("substantial risk") (quotations omitted); *Mahmoud*, 606 U.S. at 560 (same); *Department of Commerce*, 588 U.S. at 767 (same); *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 153–54 (2010) (same); *Flaxman v. Ferguson*, 151 F.4th 1178, 1185, 1187 (9th Cir. 2025) (same); *Diamond Alt. Energy*, 606 U.S. at 114 ("'object' of a government regulation"); *Lujan*, 504 U.S. at 561–62 ("object of the action").

Further, the panel's opinion is inconsistent with other circuits' rulings recognizing that incremental risk (particularly when viewed in light of the gravity of the harm) presented by a challenged law is enough to show standing. *See, e.g.*, *Glickman*, 92 F.3d at 1234–35. While the panel claims that the incremental-risk analysis is relevant only to the redressability prong of standing (rather than injury-in-fact), *see* Op. at 23—a questionable contention—the panel makes no attempt to reconcile its holding with other circuit holdings that such an analysis *does* bear on injury-in-fact. *See, e.g.*, *Glickman*, 92 F.3d at 1234–35; *Baur v. Veneman*, 352 F.3d 625, 637 (2d Cir. 2003) ("Because the evaluation of risk is qualitative, the probability of harm which a plaintiff

must demonstrate in order to allege a cognizable injury-in-fact logically varies with the severity of the probable harm."). This divergence justifies en banc review.

In refusing to find standing, the panel relies on *Lujan*. But *Lujan* provides no such support. The plaintiffs there failed to show "injury in fact"—which would have allowed them to challenge a regulation limiting the scope of the consultation requirements under the Endangered Species Act—because, in the Court's view, their "mere profession of an intent, some day, to return" to places where endangered species were located was "simply not enough." *Lujan*, 504 U.S. at 564 & n.2. The Court reasoned that the concept of "imminence" required for standing, though "somewhat elastic," has been "stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly *within the plaintiff's own control*." *Id.* (emphasis added).

Not so here. The parents' alleged injuries are *not* within their own control, and thus do not stretch the "imminence" standard beyond the breaking point but comfortably meet it. The parents' children, unfortunately, present a flight risk and, by operation of state law, licensed shelters who receive them are banned from notifying the parents and must instead report the incident to a state agency that would facilitate "gender-affirming" treatment for those children. [1]    And

---

[1] Even those unlicensed shelters or individuals (such as family friends) who receive a runaway child need not notify the parents under Washington law, but can notify the Department instead. *See* Wash. Rev. Code § 13.32A.082(1)(a) ("[A]ny person, unlicensed youth shelter, or runaway and homeless youth program" who provides shelter to a runaway child "shall promptly report the location of the child to the

again, by the law's design, this could all be done without the parents' knowledge or consent. The parents have thus alleged a credible threat of future injuries.[2]

The panel erred in another fundamental way. Undisputed here, basic principles of pleading require that courts, at the motion-to-dismiss stage, accept all plaintiffs' factual allegations as true and draw all reasonable inferences in the plaintiffs' favor. *See Thomas v. County of Humboldt, California*, 124 F.4th 1179, 1186 (9th Cir. 2024); *see also National Rifle Association of America v. Vullo*, 602 U.S. 175, 181 (2024). The panel did the very opposite.

One example is enough to prove the point. The panel appears to acknowledge, in a footnote, that the parents who have alleged (among other things) that their child previously "ran away from home" present the strongest case for standing. *See* Op. at 21 n.7. But in dismissing those allegations, the panel reasoned that "Plaintiffs make no claim that 5C ran away to a licensed shelter, did so without parental permission, or is seeking or receiving gender-affirming care." *See id.* That reasoning is deeply flawed and construes the parents' allegations in the most *disfavorable* light.

First, contrary to the panel, the parents are not required to allege that 5C ran away to a "licensed shelter." The fact that 5C ran away because of disagreement with 5C's parents

---

parent, the law enforcement agency of the jurisdiction in which the person lives, *or the department*.") (emphasis added).

[2] Judge VanDyke's forceful dissent concludes that "actual" injury exists; to the extent that the parents experience a *current* interference with their ability to direct the upbringing of their children—due to the credible threat of injury that Washington law poses—I would also find standing on that basis.

about gender-identity affirmation supports a "substantial risk" that 5C would run away again and that, next time, 5C would run away to a shelter subject to the law requiring the shelter to withhold parental notification, since that is the sort of "safe place" affording the most "protection" (and thus posing the most attraction) for a gender-dysphoric child. 1 ER 22–23. That is enough for standing. Only by drawing inferences in favor of the State (rather than the plaintiffs) could the panel conclude that standing was lacking.

Second, the panel faults the parents for not expressly claiming that 5C ran away "without parental permission." Op. at 21 n.7. Respectfully, that criticism borders on the risible. When the parents alleged that 5C "ran away," the only reasonable inference is that 5C ran away without their permission. *See* Black's Law Dictionary 1603 (12th ed. 2024) (defining "runaway" as "[s]omeone who is fleeing or has escaped from custody, captivity, restraint, or control; esp. a minor who has voluntarily left home *without permission* and with no intent to return") (emphasis added). Simply grasping at straws here, the panel essentially required the parents to recite vacuous "magic words" in their complaint, while construing the parents' complaint "in the least charitable light." *Flaxman*, 151 F.4th at 1187. Our cases have repeatedly rejected that approach. *See, e.g.*, *id.* at 1184 (citing *Manzarek v. Saint Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030–31 (9th Cir. 2008)).

And finally, the panel says that the parents failed to allege that 5C was "seeking or receiving gender-affirming care." The panel is wrong here, too. The parents alleged that, after having run away once, their child (5C) "still identifies as 'transgender' at school" and "currently sees a school counselor" who supports 5C "in 'transitioning.'" 1 ER 23. Moreover, the parents alleged, "5C has . . . in the

past seen therapists for a couple of years, and she has had conversations with numerous therapists and behavior health specialists about gender identity and 'transitioning.'" *Id.* Drawing inferences in the parents' favor, one must conclude that the fear they harbor that their child would seek or receive "gender-affirming care" (as defined broadly under Washington law) is reasonable and justifies standing. *See* Wash. Rev. Code § 74.09.675(3) ("gender-affirming treatment" means "a service or product that a health care provider . . . prescribes to an individual to support and affirm the individual's gender identity.").

Perhaps recognizing the weakness of these arguments, the panel pivots to another. "In any event," the panel states, "the allegation that 5C ran away once is not sufficient to suggest that 5C will do so again in the future." Op. at 21 n.7. But even here, the panel errs. Is it so unreasonable to "suggest" that a child who suffers from gender dysphoria and has run away because of the parents' views on the matter could run away again? Particularly, where the parents have not changed their views in refusing to "affirm" the child's gender identity? We must draw all reasonable inferences in the parents' favor. Doing so requires us to conclude that their concerns about their child's flight risk are reasonable and thus create standing.

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), which the panel cites, is hardly analogous. There was no indication there that the plaintiff would commit another crime that would subject him to the city's chokehold policy and that the police "would illegally choke him into unconsciousness" (again). *Id. at* 105–06. But here, there is a substantial risk that the parents' child would seek shelter considering the child's past behavior, particularly where the motivations for the child's running away the first time remain. Indeed, the

whole point of the law was "to remove barriers" to accessing shelters that would facilitate "gender-affirming" treatment for runaway children.  *See* Engrossed Substitute S.B. 5599 § 1, 68th Leg., Reg. Sess. (Wash. 2023), *enacted as* 2023 Wash. Sess. Laws, ch. 408; *see also* 1 ER 10 (Mot. to Dismiss) (same).  It is "odd" for the State to champion the law's intended effects while denying them here in an attempt to defeat standing.  *Diamond Alt. Energy*, 606 U.S. at 118–19.

\*         \*         \*

This court has routinely found standing based on future injuries in cases with alleged facts that appear more attenuated than the facts alleged here.  In cases where plaintiffs have alleged risk of harms to aesthetic and recreational enjoyment, harms to privacy interests, potential exposure to chemicals, and other types of future harms, the Court has had no problem finding standing.[3]

---

[3] *See, e.g.*, *Harris*, 366 F.3d at 761–62 (holding that county residents who claim to rely on the county health care system for their health needs had standing to challenge the county's decision to reduce the number of hospital beds at a county hospital—even though they had no immediate need for those beds—because plaintiffs alleged a "concrete *risk* of harm," and because the county's "decision to pare down its healthcare system . . . presents the proverbial accident waiting to happen" (citation omitted)); *Covington*, 358 F.3d at 638–39 (holding that "the relevant inquiry" for standing is whether defendants' "actions have caused 'reasonable concern' of injury to" the plaintiffs, and concluding that there was a reasonable concern, where the plaintiffs alleged that violations of the Resource Conservation and Recovery Act "increase[d] the risks of . . . injuries to [them]" by threatening the "aesthetic and recreational enjoyment of their property") (quoting *Laidlaw Env't Servs.*, 528 U.S. at 183); *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1140–43 (9th Cir. 2010) (holding that plaintiffs "whose personal information has been stolen but not misused" nevertheless have "suffered an injury

But when it comes to the fraught topic of gender identity and whether parents have the right to direct the treatment of a child suffering from gender dysphoria, courts have appeared to use standing doctrine to dodge the issue, characterizing the parents' alleged harms as speculative when they appear actual or imminent.[4] "Article III standing is an important component of our Constitution's structural design," and "[t]hat doctrine is cheapened when the rules are not evenhandedly applied." *Murthy v. Missouri*, 603 U.S. 43, 98 (2024) (Alito, J., dissenting).

In this case, the parents have alleged that Washington law poses a substantial risk of harm to their ability to direct the upbringing of their children and that the law violates their constitutional rights. However difficult this issue may be for

---

sufficient to confer standing" where they "had alleged an act that increased their risk of future harm," and holding, too, that a plaintiff's allegation that he "has generalized anxiety and stress" as a result of the theft suffices as "present injury"); *Nat. Res. Def. Council v. EPA*, 735 F.3d 873, 878 (9th Cir. 2013) (holding that an entity had standing to challenge EPA's decision to approve a pesticide, where the entity alleged that the decision posed a "'credible threat' that its members' children will be exposed to [the allegedly harmful pesticide]").

[4] *See John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 636 (4th Cir. 2023) (Niemeyer, J., dissenting) (arguing the majority "reads the Parents' complaint" in "an unfairly narrow way" to deny standing), *cert. denied sub nom. Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 144 S. Ct. 2560 (2024); *Parents Protecting Our Children, UA v. Eau Claire Area Sch. Dist., Wisconsin*, 95 F.4th 501, 506 (7th Cir. 2024); *see generally Parents Protecting Our Children, UA v. Eau Claire Area Sch. Dist., Wisconsin*, 145 S. Ct. 14, 14–15 (2024) (Alito, J., dissenting from denial of certiorari) ("I am concerned that some federal courts are succumbing to the temptation to use the doctrine of Article III standing as a way of avoiding some particularly contentious constitutional questions."); *Lee v. Poudre Sch. Dist. R-1*, 607 U.S. --- (2025) (Alito, J., concurring in denial of certiorari) (similar).

us to resolve, this court should have grasped the nettle and held that there was standing in accordance with settled Supreme Court and Ninth Circuit law. Respectfully, I dissent from the denial of rehearing en banc.